**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO.** |
| **v.** | **JUDGE** |
| **JOHN K. ECKERD, JR. (1)** | **INDICTMENT** |
| **AFIF BALTAGI (2)** | 18 U.S.C. § 1349 |
| | 18 U.S.C. § 1956(h) |
| | 18 U.S.C. § 371 |
| | **FORFEITURE** |

**THE GRAND JURY CHARGES:**

<u>**INTRODUCTORY ALLEGATIONS**</u>

At all times relevant to this Indictment:

1.      Defendant **JOHN K. ECKERD, JR.** resided in the area of Dallas, Texas, and he represented himself to potential investors as an entrepreneur and businessman, as well as an expert in the market for off-the-road (OTR) tires.  OTR tires are commonly used on enormous earth-moving and mining equipment throughout the world.

2.      Since at least in or around 2012, through and including at least 2019, the exact dates being unknown to the Grand Jury, **ECKERD**, with others, had control of and/or access to various corporations related to an OTR tire investment scheme described further in this Indictment.

3.      Since at least in or around 2012, through and including at least the early part of 2018, the exact dates being unknown to the Grand Jury, Jason Adkins (a co-conspirator not named in this Indictment), with others, had control of and/or access to various corporations related to the OTR tire scheme described further in this Indictment.

4.      Company A, a corporation located in New Jersey, was operated by one or more members of the conspiracy as a business that provided services related to importing and exporting goods, and logistics.

5.      In addition, in furtherance of the wire fraud and money laundering schemes described in this Indictment, one or more members of the conspiracy created Company B, a corporation located in New Jersey, purportedly to provide various services related to importing and exporting goods.

6.      One or more members of the conspiracy owned and operated Company A and Company B.

7.      Since at least in or around 2012, through and including on or about March 1, 2018, the exact dates being unknown to the Grand Jury, Adkins owned and operated various Ohio- and Delaware-based commercial tire companies allegedly specializing in the business of buying and selling OTR tires.

8.      Todd Wilkin (a co-conspirator not named in this Indictment) was a majority owner of, and ran the daily operations for, Company C, a tire sales and service company located in Hillsboro, Ohio, in the Southern District of Ohio.

9.      Defendant **AFIF BALTAGI** resided in the area of Houston, Texas, and worked in logistics for Company D, a freight and logistics company that had access to a storage yard in Houston where multiple OTR tires were stored (the "Tire Yard").

10.     The Internal Revenue Service was an agency of the United States Department of Treasury responsible for enforcing and administering the federal tax laws of the United States, and collecting taxes owed to the United States.

11.     At least one co-conspirator in each of the wire fraud, money laundering, and tax fraud schemes outlined in this Indictment resided, and took actions in furtherance of the schemes, in the Southern District of Ohio.

12.     Multiple co-conspirators initiated transactions related to the wire fraud, money laundering, and tax fraud schemes outlined in this Indictment from the Southern District of Ohio.

13.     Multiple victims of the wire fraud scheme outlined in this Indictment resided in the Southern District of Ohio.

## COUNT 1
### (Conspiracy to Commit Wire Fraud)

14.     The allegations contained in Paragraphs 1 through 13 of this Indictment are re-stated and re-alleged as if fully set forth herein.

15.     Beginning in or around 2012, and continuing through in or around late 2018, the exact dates being unknown to the Grand Jury, in the Southern District of Ohio and elsewhere, the Defendants, **JOHN K. ECKERD, JR.** and **AFIF BALTAGI**, together with Adkins, Wilkin, and others, both known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree to commit wire fraud; that is, with intent to defraud, to devise and intend to devise a scheme to defraud financial investors to deprive another of money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions—to wit, to defraud investors in OTR-tire financing transactions by accepting millions of dollars under false pretenses—and for the purpose of executing and attempting to execute the scheme, knowingly used and caused another to use wire communications in interstate and foreign commerce, in violation of 18 U.S.C. § 1343.

## Manner and Means of the Conspiracy

16.     The manner and means by which **ECKERD**, **BALTAGI**, and others sought to accomplish the object of the conspiracy include, but are not limited to, the following:

### *The Defendants conspired to defraud OTR-tire investors.*

17.     The Defendants' conduct was part of a fraudulent investment conspiracy perpetrated by the Defendants **ECKERD** and **BALTAGI**, as well as by Jason Adkins, Todd Wilkin, and others. As part of the conspiracy, the Defendants, as well as Adkins, Wilkin, and others, agreed to participate in a scheme to solicit investment and loan money for fraudulent or entirely fictitious OTR tire deals. The co-conspirators and others fraudulently promised investors that investment funds would be used to purchase pre-identified OTR tires, often at a discount, and that the tires would then be re-sold to a buyer who had already been secured by **ECKERD**, Adkins, and others, at a higher rate, thus purportedly yielding a large profit on their investment. **ECKERD**, Adkins, and others solicited the financing for numerous such tire transactions, all with the intent to misappropriate the money that was to be used for the purported purchase and re-sale of OTR tires, and often despite having no intentions of either purchasing or selling any such OTR tires.

### *ECKERD and others pitched would-be investors on OTR tire deals and stole investment money.*

18.     It was further part of the conspiracy that **ECKERD**, Adkins, and others would recruit potential investors in the scheme, including companies, small businesses, family, and friends, some of whom themselves then recruited additional investors.

19.     It was further part of the conspiracy that various co-conspirators, including **ECKERD**, Adkins, and others, made sales pitches to multiple potential investors related to buying and selling OTR tires. In these pitches, **ECKERD**, Adkins, and others generally represented that they knew of OTR tires available for sale at a discount that could be resold at a large profit.

4

According to the co-conspirators, investors' money was needed to purchase the OTR tires. The large profit on the deals was purportedly to be shared between the co-conspirators and the investors.

20.     It was further part of the conspiracy that **ECKERD**, Adkins, and others presented would-be investors with documentation related to the purported tire deals, some of which described the OTR market and explained the potential profitability of the deals.

21.     It was further part of the conspiracy that, once investors committed to invest money in the fraudulent tire scheme, Adkins, at **ECKERD's** direction, often signed nearly all of the paperwork associated with the tire transactions, limiting **ECKERD's** connection to the deals on paper.

22.     It was further part of the conspiracy that **ECKERD**, **BALTAGI**, Adkins, and others corresponded with the potential investors face-to-face, as well as through a combination of phone calls, text messages, and, on occasion, e-mails.  During such communications, **ECKERD**, Adkins, and others requested large investments and loans, most to be funded through wire transfers.  As part of the scheme, **ECKERD** and Adkins sometimes requested that money be sent directly to them, to other entities that they owned, operated, or could access, or to other members of the conspiracy.

23.     It was further part of the conspiracy that **ECKERD**, Adkins, and others would often repay investors' principal and interest related to an initial smaller investment, thereby enticing the investors to invest even more money at the next available opportunity.

24.     It was further part of the conspiracy that there were, in fact, rarely any tires bought or sold, and that **ECKERD**, Adkins, and others knew when they were inducing investors to wire

money that there were no tires being evaluated for purchase or re-sale, and that they had no intent to carry out the tire transactions they had presented to the investors.

25.     It was further part of the conspiracy that **ECKERD**, Adkins, and others used the same OTR tires, with the same serial numbers, as the basis for multiple deals, meaning that **ECKERD**, Adkins, and others promised multiple investors that they each owned the same tires.

26.     It was further part of the conspiracy that, once the investor-victims had invested money in the purported deals, the co-conspirators would tell investor-victims that the purported deals had encountered a problem that prevented the purported deals from going through as planned. It was at this point that **ECKERD** often stopped communicating with the investor-victims.

27.     It was further part of the conspiracy that **ECKERD**, Adkins, and others obtained millions of dollars from investors related to the fraudulent tire deals.

28.     It was further part of the conspiracy that **ECKERD**, Adkins, and others tried to delay unsatisfied investors from taking action to recoup their investments.  Such steps included, for example, falsely representing that the deal for which the investor gave money fell through, but that there were other potential buyers who might revive the deal; or representing that a small portion of tires were sold and, again, that other potential buyers might step in to purchase the remaining tires; or promising to make regular repayments to investors, despite not having the intent to do so.

29.     It was further part of the conspiracy that **ECKERD**, Adkins, and others engaged in Ponzi-type activity by paying old investors with money received from new investors.

30.     It was further part of the conspiracy that **ECKERD**, Adkins, and others provided investment victims with false documents—such as false tax returns, for example—to induce fraudulent investments and to delay promised payments.

31.     It was further part of the conspiracy that **ECKERD**, Adkins, and others used flamboyant travel, like the use of private planes, to showcase tire inventory and make themselves appear wealthy and successful to potential investors.

*One or more members of the conspiracy posed as a neutral third party*
*to safely hold investors' funds in escrow.*

32.     It was further part of the conspiracy that, to give potential investors confidence in the tire deals, the co-conspirators offered a purportedly neutral third party to arrange shipment of the tires and/or hold investment funds in escrow until certain conditions were met in completing the deal.  On some occasions, members of the conspiracy entered into an escrow agreement with the investor that specified the conditions under which the member of the conspiracy, acting as a purported escrow agent, could release the investor's funds to the seller of the tires.

33.     It was further part of the conspiracy that, when investor funds arrived in a bank account controlled by a member of the conspiracy ostensibly acting as an escrow agent, that co-conspirator promptly disbursed the funds via wire transfer to bank accounts specified by **ECKERD** and Adkins.  Such bank accounts included accounts controlled by co-conspirators or by investors who had been victimized in prior deals.  In addition, members of the conspiracy posing as an escrow agent on occasion transferred a portion of the investor funds purportedly held in escrow to another bank account to which they had access. In disbursing the funds as they did, members of the conspiracy posing as an escrow agent frequently acted contrary to the terms of their alleged role as escrow agent in the deals.

*Todd Wilkin posed as a neutral third party to sell OTR tires.*

34.     It was further part of the conspiracy that Wilkin posed as a neutral third-party seller of OTR tires in deals arranged by Adkins, even though he was working with Adkins.

35.     It was further part of the conspiracy that Wilkin spoke with multiple potential investors concerning his and Company C's role in the transactions. Wilkin did so to convince potential investors that the deals were legitimate. These conversations sometimes took place in person in Ohio. In these conversations, Wilkin reassured potential investors that there were really OTR tires for sale and that Company C either owned or could obtain the tires for sale. Wilkin also presented himself and Company C as neutral third-party tire sellers unconnected with Adkins and the other members of the conspiracy. Wilkin did so knowing that neither he nor Company C possessed the OTR tires or intended to obtain or sell them.

36.     It was further part of the conspiracy that Wilkin used Company C to create documents to convince potential investors that the tire deals were legitimate. For example, Wilkin caused documents to be created indicating that Company C possessed, or could obtain, certain tires for a certain price; such documents were then used by Adkins to show potential investors that tires were truly available at a certain price. After the investment money came in and was sent to Company C to purchase the tires, Wilkin caused Company C to promptly forward a majority of the funds to co-conspirators involved in the scheme. Wilkin then caused Company C to retain a portion of the incoming money as payment. All of this occurred despite the fact that neither Wilkin nor Company C possessed, or attempted to obtain, the tires described in the price-quote documents.

***BALTAGI worked with co-conspirators to use the Tire Yard to deceive investors.***

37.     It was further part of the conspiracy that **ECKERD**, Adkins, and others used the Tire Yard, located in Houston, Texas, to facilitate the fraudulent conspiracy. (As noted, the Tire Yard was associated with **BALTAGI's** employer, Company D, and **BALTAGI** had access and some control over the Tire Yard.) **ECKERD**, Adkins, and others, working with **BALTAGI**, took would-be investors to the Tire Yard to show them tires that were purportedly involved in the tire

8

transactions—even though, unbeknownst to the would-be investors, **ECKERD**, Adkins, and others often showed the same tires to potential investors in many of the deals.

38.     It was further part of the conspiracy that **BALTAGI** used his position with Company D to make the tire deals appear legitimate.  Working with co-conspirators—including Adkins, for example—**BALTAGI** spoke to various investor-victims who were inquiring about whether the tires in which they had invested were located at the Tire Yard.  In doing so, **BALTAGI** assured investor-victims that he understood that they had an ownership interest in particular sets of tires that were purportedly held at the Tire Yard, even though he knew multiple other investor-victims also claimed an ownership interest in the same tires. He also informed investor-victims that particular tires had been shipped to or from the Tire Yard knowing this was not true.

39.     It was further part of the conspiracy that **BALTAGI** communicated with Adkins and others about what to say to investor-victims asking about the tires.

40.     It was further part of the conspiracy that **BALTAGI** gave investor-victims tours of the Tire Yard to make them believe the tires in which they were considering investing or had invested were safe and secure.

**All in violation of Title 18, United States Code, Section 1349.**

## COUNT 2
### (Money Laundering Conspiracy)

41.     The allegations contained in Paragraphs 1 through 13 of this Indictment are re-stated and re-alleged as if fully set forth herein.

42.     Beginning in or around 2012, and continuing through in or around late 2018, the exact dates being unknown, in the Southern District of Ohio and elsewhere, Defendant **JOHN K. ECKERD, JR.** did knowingly combine, conspire, and agree with other persons known and unknown to the Grand Jury—including, among others, Jason Adkins and Todd Wilkin, not named

in this Indictment—to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, namely:

        a.   To knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity—namely, wire fraud—knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(l)(B)(i); and

        b.   To knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity—namely, wire fraud—in violation of 18 U.S.C. § 1957.

## Manner and Means of the Conspiracy

43.    The manner and means by which **ECKERD** and others sought to accomplish the objects of the conspiracy include but are not limited to the following:

44.    The allegations contained in Paragraphs 17 through 40 of this Indictment are re-stated and re-alleged as if fully set forth herein.

45.    It was further part of the conspiracy that **ECKERD**, Adkins, and others created numerous corporate entities and associated bank accounts to receive and disperse the fraud

proceeds. Few, if any, of these accounts were in **ECKERD's** name. Instead, at **ECKERD's** direction, many of these accounts were placed in other people's names, though **ECKERD** had control of and access to the accounts.

46. It was further part of the conspiracy that wire transfers involving fraud proceeds often traveled to, or through, bank accounts to which **ECKERD** had access or control.

47. It was further part of the conspiracy that wire transfers involving fraud proceeds often traveled to, or through, bank accounts to which Adkins had access or control.

48. It was further part of the conspiracy that, when fraud proceeds arrived in a bank account controlled by members of the conspiracy purporting to act as an escrow agent, such members of the conspiracy promptly disbursed the proceeds via wire transfer to bank accounts specified by Adkins and **ECKERD**. These bank accounts differed from one deal to the next, but they generally included bank accounts controlled by co-conspirators or by investors who had been victimized in prior deals. In disbursing the fraud proceeds this way, members of the conspiracy frequently acted contrary to the terms of their role as a neutral third party, and/or contrary to the terms of their role outlined in any applicable escrow agreement.

49. It was further part of the conspiracy that **ECKERD**, Adkins, and others attempted to conceal the scope of the scheme and frustrate attempts to trace the proceeds of the scheme by making complex bank transactions involving multiple companies and bank accounts. Through these transactions, the co-conspirators transferred millions of dollars of fraud proceeds to accounts controlled by **ECKERD**, Adkins, and others. Adkins and others frequently conducted these transactions—often in amounts of more than $10,000—at **ECKERD's** direction.

50. It was further part of the conspiracy that **ECKERD,** Adkins, and others diverted fraud proceeds to other businesses created by **ECKERD**, including MyMojo and Trident Lakes.

51.     It was further part of the conspiracy that **ECKERD** directed Adkins, and others, to use fraud proceeds to make mortgage payments—many in excess of $10,000—on **ECKERD's** behalf.

52.     It was further part of the conspiracy that **ECKERD,** Adkins, and others used the fraud proceeds to make purchases for themselves, many of which were over $10,000, including, for example, payments for cars, vacations, and real property.

**All in violation of Title 18, United States Code, Section 1956(h).**


## COUNT 3
### (Conspiracy Against the United States)

53.     The allegations contained in Paragraphs 1 through 13 are re-stated and re-alleged as if fully set forth herein.

54.     From at least in or around 2016, and continuing through on or about April 15, 2019, the exact dates being unknown to the Grand Jury, in the Southern District of Ohio and elsewhere, Defendant **JOHN K. ECKERD, JR.,** as well as Jason Adkins (a co-conspirator not named in this Indictment) and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of a government agency—namely the Internal Revenue Service of the Department of the Treasury—and to commit offenses against the United States, namely evasion of the payment of tax, in violation of 26 U.S.C. § 7201.

55.     In or around 2014 and 2015, **ECKERD** filed Forms 1040 Federal Income Tax Returns for Tax Years 2013 and 2014. Based on those forms, **ECKERD's** tax obligations for Tax Years 2013 and 2014 amounted to more than $1,000,000. **ECKERD** has not satisfied that tax obligation.

12

56.     On or about May 18, 2016, the IRS filed a notice of federal tax lien regarding **ECKERD's** unpaid tax obligations for Tax Years 2013 and 2014.

## **Manner and Means of the Conspiracy**

57.     The manner and means by which **ECKERD** and others sought to accomplish the objects of the conspiracy include but are not limited to the following:

58.     The allegations contained in Paragraphs 17 through 40 of this Indictment and 45 through 52 of this Indictment are re-stated and re-alleged as if fully set forth herein.

59.     It was part of the conspiracy that **ECKERD**, Adkins, and others would and did impede, impair, obstruct, and defeat the lawful government functions of the Internal Revenue Service of the Department of the Treasury in its collection of income taxes owed by **ECKERD** for Tax Years 2013 and 2014.

60.     It was further part of the conspiracy that **ECKERD**, Adkins, and others, while **ECKERD** was earning substantial amounts of income from fraudulent OTR tire transactions, would and did arrange that **ECKERD** would pay none of his assessed income taxes for Tax Years 2013 and 2014, and would file no U.S. Individual Income Tax Returns for Tax Years 2016 through 2018.

61.     It was further part of the conspiracy that **ECKERD**, Adkins, and others attempted to conceal **ECKERD's** income from the fraudulent OTR tire transactions.

62.     It was further part of the conspiracy that **ECKERD**, Adkins, and others would and did form various corporations in which **ECKERD** would conceal assets and income from the Internal Revenue Service.

63.     It was further part of the conspiracy that **ECKERD**, Adkins, and others put business bank accounts of the above corporations in the names of others to hide that **ECKERD** was the true beneficial owner of the corporations' assets.

64.     It was further part of the conspiracy that **ECKERD**, Adkins, and others caused income generated by **ECKERD**, including income related to the fraudulent OTR tire transactions, to be diverted to the above-mentioned corporate bank accounts, to hide funds that **ECKERD** could have used to satisfy his assessed income taxes for Tax Years 2013 and 2014.

65.     It was further part of the conspiracy that **ECKERD**, Adkins, and others would and did make large payments, using money controlled by **ECKERD** in various corporate bank accounts, including the above corporate bank accounts, for purposes other than to pay **ECKERD's** tax liabilities to the Internal Revenue Service.  For example, some of this money was used to pay **ECKERD's** creditors other than the Internal Revenue Service, to support **ECKERD's** various businesses or investment schemes, and to pay **ECKERD's** personal expenses.

66.     It was further part of the conspiracy that **ECKERD** and others would and did consult multiple accountants regarding **ECKERD's** tax liabilities, and, in doing so, would and did provide incomplete and untruthful information to the accountants.

67.     It was further part of the conspiracy that **ECKERD** used credit cards held in other people's names for his monthly living expenses.

68.     It was further part of the conspiracy that **ECKERD** earned more than $10 million in gross income from the fraudulent OTR tire transactions described in this Indictment, and he directed most of these funds to bank accounts held in other people's names.

## Overt Acts in Furtherance of the Conspiracy

69.     In furtherance of the conspiracy and to effect the objects thereof, the following overt acts were committed by **ECKERD**, Adkins, and others in the Southern District of Ohio and elsewhere:

70.     On or about June 17, 2016, **ECKERD** emailed Adkins, attaching a fraudulent line-of-credit agreement for Adkins to sign and return to **ECKERD**. By this time, **ECKERD** had received significant income from the fraudulent tire transactions. However, at **ECKERD's** direction, Adkins and **ECKERD** entered into the fraudulent line-of-credit agreement. The fraudulent line-of-credit agreement purported to operate retroactively, falsely describing the tire-fraud money that Adkins had sent to **ECKERD** as loans to **ECKERD**, rather calling the money what it really was: income to **ECKERD**. Adkins responded to **ECKERD's** email with a signed version of the fraudulent line-of-credit agreement. At some point shortly thereafter, **ECKERD** caused the fraudulent line-of-credit agreement to be sent to his accountant, as a way of covering up his income from the tire scheme.

71.     On or about November 14, 2016, **ECKERD** filed his 2015 Form 1040 Federal Income Tax Return, which falsely reported that he had no income derived from tire sales commissions, despite his having received substantial payments from Adkins and others related to OTR tire deals.

72.     On or about July 1, 2016, **ECKERD** filed a Form 433-A with the IRS seeking to get on a payment plan for **ECKERD's** existing tax liabilities. In doing so, **ECKERD** failed to disclose certain financial information, including, for example, his access to money in a bank account for La Mia Bella Famiglia.

15

73.     On or about October 15, 2017, **ECKERD** willfully failed to file a U.S. Individual Income Tax Return for Tax Year 2016, despite a legal obligation to do so.

74.     On or about October 15, 2018, **ECKERD** willfully failed to file a U.S. Individual Income Tax Return for Tax Year 2017, despite a legal obligation to do so.

75.     On or about July 3, 2018, bank account x7849 in the name of US Elements Corp., an account to which **ECKERD** had access or control, received a transfer of $865,000 from a victim of **ECKERD's**, which transfer the victim understood to be an investment in the purchase of OTR tires.

76.     On or about July 12, 2018, **ECKERD** filed a voluntary petition for Chapter 7 Bankruptcy in the Eastern District of Texas. Thereafter, he filed supporting documentation, which falsely reported his sources of income.

77.     On or about July 12, 2018, **ECKERD** directed the transfer of $1,000,000 from bank account x7849 in the name of US Elements Corp., an account to which **ECKERD** had access and control, to bank account x0710 in the name of Second Star Technologies, an account to which **ECKERD** had access and control.

78.     On or about July 25, 2018, **ECKERD** directed the payment of $100,000 via wire transfer from bank account x0710 in the name of Second Star Technologies to bank account x3651 in the name of Progressive Mining Corporation, an account to which **ECKERD** had access and control.

79.     On or about August 22, 2018, **ECKERD** directed the transfer of $615,000 from bank account x0710 in the name of Second Star Technologies to bank account x4933 in the name of Thomas Design and Management, an account to which **ECKERD** had access and control.

80.     On or about October 12, 2018, **ECKERD** directed the transfer of $300,970 from bank account x4933 in the name of Thomas Design and Management to bank account x0580 in the name of Vortice Industries, an account to which **ECKERD** had access and control.

81.     On or about October 22, 2018, **ECKERD** directed the issuance of a counter check, made out to cash, in the amount of $63,000 from bank account x0580 in the name of Vortice Industries, an account to which **ECKERD** had access and control.

82.     On or about October 31, 2018, **ECKERD** directed the issuance of a check, made out to the name of a family trust of one of **ECKERD's** fraud victims, in the amount of $23,800 from bank account x0580 in the name of Vortice Industries, an account to which **ECKERD** had access and control. The memo on the check was "Interest Payment."

83.     On or about April 15, 2019, **ECKERD** willfully failed to file a U.S. Individual Income Tax Return for Tax Year 2018, despite a legal obligation to do so.

**All in violation of 18 U.S.C. § 371.**

## FORFEITURE ALLEGATION A

84.     The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America.

85.     Upon conviction of any of the offenses as alleged in Count 1 of this Indictment, Defendants **JOHN K. ECKERD, JR.** and **AFIF BALTAGI** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343, or a conspiracy to commit such offense in violation of 18 U.S.C. § 1349, as alleged in this Indictment, in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)

86.     Substitute Assets: If any of the forfeitable property described above, as a result of any act or omission of Defendants **JOHN K. ECKERD, JR.** and **AFIF BALTAGI**:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of Defendants **JOHN K. ECKERD, JR.** and **AFIF BALTAGI** up to the value of the forfeitable property.

     **Forfeiture notice in accordance with 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Rule 32.2 of the Federal Rules of Criminal Procedure.**

## FORFEITURE ALLEGATION B

87.     The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America.

88.     Upon conviction of any of the offenses as alleged in Count 2 of this Indictment, Defendant **JOHN K. ECKERD, JR.** shall forfeit to the United States any property, real or personal, involved in a violation of 18 U.S.C. § 1956, as alleged in this Indictment, or any property traceable to such property, in accordance with 18 U. S. C. § 982(a)(l).

89.     <u>Substitute Assets</u>: If any of the forfeitable property described above, as a result of any act or omission of Defendant **JOHN K. ECKERD, JR.**:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of Defendant **JOHN K. ECKERD, JR.** up to the value of the forfeitable property.

    **Forfeiture notice in accordance with 18 U.S.C. § 982(a)(1) and Rule 32.2 of the Federal Rules of Criminal Procedure.**

                      **A TRUE BILL.**

                    s/Foreperson

                    **FOREPERSON**

**KENETH L. PARKER**
**UNITED STATES ATTORNEY**

**S. COURTER SHIMEALL (OH 0090514)**
**PETER K. GLENN-APPLEGATE (OH 0088708)**
**DAVID J. TWOMBLY (OH 0092558)**
**Assistant United States Attorneys**